764 P.2d 327

**AMCOR INVESTMENT CORPORA-TION, a California corporation, Plaintiff/Appellant,**

v.

**COX ARIZONA PUBLICATIONS INC., a Delaware corporation; Max Jennings and Carol Jennings, Defendants/Appellees.**

No. 2 CA-CV 88-0157.

Court of Appeals of Arizona, Division 2, Department B.

June 23, 1988.

Review Denied Dec. 6, 1988.

Goldstein, Kingsley & Myres, Ltd. by Philip T. Goldstein, Phoenix, for plaintiff/appellant.

Brown & Bain by Robert E.B. Allen, David J. Bodney, and Michael W. Patten, Phoenix, for defendants/appellees.

OPINION

CHARLES E. ARES, Judge Pro Tem.*

This libel case requires us to determine whether an entire newspaper column is absolutely protected by the First and Fourteenth Amendments of the U.S. Constitution.

On December 21, 1986, Max Jennings, the executive editor of the *Mesa Tribune*,

* NOTE: Charles E. Ares was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. Art. VI, § 3 and A.R.S. §§ 12-145-47.

published the following column on the editorial page of the newspaper[1]:

Deafening development

Homes, flight path make poor neighbors

Max Jennings

Commentary

The Mesa City Council has made perhaps its biggest mistake ever in approving a vast new high-density housing project under the screaming engines of Williams Air Force Base jets. The project, labeled as The Crossings, is the second-largest commercial development in city history.

The 1,023–acre development will, in effect, be a new city. It will involve more than 3,000 homes, near the intersection of the Superstition Freeway and the proposed southeast loop freeway near Ellsworth Road in southeast Mesa.

There will be shopping, schools, a hotel —all the necessary things for people to live. In short, it's absolute insanity.

Williams Air Force Base officials already have warned that during bad weather they send as many as 150 jets a day over the area. The development lies directly beneath the base's bad-weather landing approach. In this respect, The Crossings is aptly named. Those jets are flown by student pilots, the most inexperienced the Air Force has. And, again, these flights over The Crossings will come, by definition, in bad weather, night and day—inexperienced pilots bringing in military aircraft in bad weather over a housing area.

Incredibly, the Air Force has warned that the T–37 and T–38 jet trainers will be only 1,600 feet high when they pass over the proposed housing and stores and schools of The Crossings. Most of us have an idea how much noise a jet makes at an airport taxiing to a gate. Imagine how much noise a military jet makes on a full throttle takeoff—and these are not whisper jets.

Yeah, there's a reason why AMCOR Investments, Inc., a subsidiary of Ameri-

can Continental Homes, is going to make a killing on The Crossings. That land in the pathway of the Williams flights has not been worth very much, for obvious reasons. Now, almost overnight, it's already worth millions more, thanks to City Council approval of the project.

Of course the developer has eagerly agreed to add extra soundproofing. That was one of the requirements for approval by the council. Even with this expensive addition, the homes will be competitively priced because they are built on land that once was believed to be suitable only for agriculture.

But who pays for soundproofing schools and police and fire stations? What do psychologists say about the effects of living in a high-noise environment? The homes may be soundproofed, but what about back yards and school playgrounds and churches? If there were only a few homes affected, it would be one thing. But now we're talking about an area that will house perhaps 10,000 or more.

The only sign of mental activity on the part of some members of the City Council came Friday morning when some attention was given toward incorporating the land around Williams into the city's new master plan.

If this reasoning is not pursued, the people at Williams ought to start packing their bags right now. It may be the busiest fighter-training base in the Free World, but wait until thousands of taxpayers and voters start flexing their political muscle to complain about noise. It's inevitable. It's happened elsewhere.

Council members Willie Wong, Keno Hawker and Peggy Rubach voted against The Crossings proposal, to their credit. I've got a suggestion for Dave Guthrie, Ross Farnsworth, Pat Blake and Mayor Al Brooks. They should drive out to The Crossings on one of Williams' bad-weather approach days, find a location where one of the thousands of

---

1. The editorial page on which the column appeared is reprinted in the Appendix to this opinion.

homes will be built, and try to have a conversation. They'll find that the jets, one after the other, will produce 70 to 80 decibels. They'll find out that they'll probably have to stop talking while each jet passes overhead—150 times a day. But, as Guthrie points out, "We have to be fair to the developer in pursuit of planning and developing his property." He's got a point, I guess. If people are dumb enough to buy houses there, why not sell 'em to 'em?

It's the largest-scale case of caveat emptor I've ever seen. Only thing I'm not sure of is whether it's buyer beware or Air Force beware. Actually, it's city beware. Another cockamamie development in a city where the thought of planning is little more than a concept. The developers win another one; the quality of life consideration takes it on the chin again.

That's becoming the pattern these days. The only winner I can see in this sorry affair is AMCOR Investment Co., which is certainly doing exactly what it should be—making money.

---

*Max Jennings is executive editor of the* Mesa Tribune.

Alleging that the column constituted corporate defamation and commercial disparagement, AMCOR Investment Corporation sued Cox Arizona Publications, Inc., the owner and publisher of the *Tribune,* and Max Jennings. On a 12(b)(6) motion[2], the trial court dismissed the complaint, concluding that the column constituted opinion protected by the First Amendment. We agree.

### I.

■ We recognize at the outset that motions to dismiss are not favored in our law and that trial courts should normally resist the temptation to abort cases at the pleading stage. *State ex rel. Corbin v.*

**2.** Ariz.R.Civ.P. 12(b)(6), 16 A.R.S.

**3.** The parties have not raised the question whether the expression in this case is protected by Article 2, Section 6, of the Arizona Constitution. Accordingly, we do not decide that ques-

*Pickrell,* 136 Ariz. 589, 594, 667 P.2d 1304, 1309 (1983). The general rule is that a complaint is to be construed liberally in the plaintiff's favor and should not be dismissed unless it appears beyond doubt that the plaintiff could prove no facts in support of its claim that would entitle it to relief. *Chirco Const. Co. v. Stewart Title and Trust,* 129 Ariz. 187, 188, 629 P.2d 1023, 1024 (App.1981). However, when the complaint implicates the fundamental value of freedom of the press, there is good reason for a court to examine the complaint with a more rigorous eye in order not to burden public debate with insupportable litigation. 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1357 at 610 (1969). *Compare Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C.Cir.1966) (holding summary disposition of case essential "[f]or the stake here, if harassment succeeds, is public debate.")

But in this case, there was no need for the trial court to construe the complaint either strictly or liberally or to speculate about what facts the plaintiff might be able to prove at trial. We do not need therefore to hold explicitly that a special pleading rule is required in First Amendment cases. The complaint here, to which the critical column was attached, set out the offending statements precisely. The sole issue for the trial court was whether the words used were, as a matter of law, actionable. We turn then to our reasons for concluding that the trial court decided that question correctly.

### II. OPINION IS ABSOLUTELY PROTECTED

■ The expression of one's opinion is absolutely protected by the First and Fourteenth Amendments to the U.S. Constitution. *MacConnell v. Mitten,* 131 Ariz. 22, 638 P.2d 689 (1981); *Glaze v. Marcus,* 151 Ariz. 538, 540, 729 P.2d 342, 344 (App. 1986).[3] The rationale for this opinion im-

tion but assume that the protection afforded press freedom by the Arizona Constitution is at least as extensive as that provided by the First Amendment.

munity is summed up in Justice Powell's dictum in *Gertz v. Robert Welch, Inc.*:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974).

The need to distinguish between fact and opinion is not new in the law of libel; it has its origins in common law cases dealing with the defense of fair comment. *Prosser and Keeton on Torts,* § 113A at 813 (5th ed. 1984). Particularly since *Gertz,* courts have struggled with the difficult task of articulating the constitutional standard by which to make the necessary distinction. We are invited by the appellant to avoid this slippery problem by leaving the job to the jury. This we plainly cannot do since the issue is one of law. *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 783 (9th Cir.1980). It could hardly be otherwise in view of the constitutional basis for the protection of opinion. *Lewis v. Time, Inc.,* 710 F.2d 549, 555 (9th Cir.1983). Although it was half-heartedly argued at one point in this case that opinion commercially disparaging a plaintiff's business or product was not entitled to constitutional protection, it is obvious that there is no basis for distinguishing between libel and disparagement in this respect. *Gertz v. Robert Welch, Inc., supra; Redco Corp. v. CBS, Inc.,* 758 F.2d 970 (3d Cir.1985). We accordingly treat them identically in this opinion.

The case before us illustrates the inadequacy of a mechanical attempt to isolate statements of fact from those of opinion. We deal here with a newspaper column evaluating and criticizing an act of governmental officials on a matter of serious public importance. It combines clearly evaluative characterizations of the project and the council's actions, predictions of the future impact of the project, and speculations about political consequences with a few statements that appear on the surface to be bare facts.

In this evolving area of the law, a number of different standards have been developed. *See generally,* R. Smolla, *Law of Defamation,* §§ 6.01–6.12 at 6–1 through 6–52 (1988). In recent times the greater number of courts have adopted some form of the flexible "totality of the circumstances" approach to the problem. They reject as too mechanical any attempt simply to distinguish linguistically between fact and opinion. Sensitivity to the values of free debate requires an analysis not only of the words used but also the context in which they appear, as well as the entire circumstances surrounding the publication. *See, e.g., Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.,* 829 F.2d 1280 (4th Cir.1987); *McCabe v. Rattiner,* 814 F.2d 839 (1st Cir.1987); *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Lewis v. Time, Inc.,* 710 F.2d 549 (9th Cir.1985); *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986); *Camer v. Seattle Post–Intelligencer,* 45 Wash.App. 29, 723 P.2d 1195 (1986).

In formulating the appropriate standard in this case, we might well use "argument" as a synonym for "opinion," since we deal with the question whether the words complained of were part of an attempt by the defendants to *persuade* their readers that a governmental act by the city council was wrong. We must also recognize that the language of public commentary is almost limitless in its richness and variety, frequently intermixing statements of fact with evaluations, conclusions, and argumentation. Any standard for determining whether a particular piece of commentary is actionable must, for example, leave considerable room for "rhetorical hyperbole." *Greenbelt Cooperative Publishing Assoc. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537–42, 26 L.Ed.2d 6, 15 (1970) (developer's negotiating tactics in zoning case called "blackmail"); *Old Dominion Branch 496, National Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("scab" defined as traitor to his God, his country, his family, and his class). It is

also obvious from the cases that courts give great weight to the context in which the statements are made. *Letter Carriers, supra,* 418 U.S. at 284–85, 94 S.Ct. at 2782.

In *Lewis v. Time, Inc., supra,* the court identified three factors in determining whether a statement expresses fact or opinion. These factors were (1) whether the words would be understood in a defamatory sense, (2) whether the statements were made in public debate, a heated labor dispute, or other circumstances in which fiery rhetoric is expected, and (3) whether the language of the statement is more likely to be understood as a statement of opinion than as fact. 710 F.2d at 553.

■ In *Ollman v. Evans, supra,* the D.C. Circuit elaborated the standard somewhat by setting out four factors to be considered. That court would consider (1) an analysis of the common usage or meaning of the language of the challenged statements, (2) the statement's verifiability, (3) the full context of the statement, that is, the entire article, and (4) the broader context or setting in which the statement appears. 750 F.2d at 979. We believe the *Lewis* and *Ollman* factors are simply restatements of the same standard. Any variations are accounted for by the different types of statements to which the standard is to be applied. Applying factors distilled from *Lewis* and *Ollman,* we readily conclude that the article in this case, considered as a whole, constituted absolutely protected opinion.

(1) *Would the words used here be understood in a factually defamatory sense?*

No words in the Jennings column attributed any illegal conduct to AMCOR. The article attacked the city council, not AMCOR. In fact, it complimented AMCOR, though in a back-handed way, for "certainly doing exactly what it should be—making money." There was no allegation or even an implication that AMCOR was guilty of illegal or criminal conduct such as was involved in *Cianci v. New Times Publishing Co.,* 639 F.2d 54 (2d Cir.1980) (article implied that mayor of Providence had com-

mitted rape and bribed victim not to prosecute) or in *Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977) (allegation that judge was corrupt). No doubt the factual statements in the column implied that AMCOR was heedless of the public interest in its drive for profits. And surely AMCOR's product was disparaged by such statements. But the statements neither assert nor imply that AMCOR had engaged in criminal or morally repugnant behavior. All the statements, given the controversy, are in the nature of predictions of future events or conditions. They are quite clearly integral parts of the editor's argument that the Mesa City Council had failed in its public duty and that AMCOR's conduct had not been in the public interest.

We would have a different case if the statements at issue had taken the form of statements of past or even present illegal or morally repugnant fact, rather than predictions of the future. For example, if an editorial column commenting on maladministration of a public hospital were to assert that one of its physicians was known to be infected with a virulently contagious disease, a court might well treat the statement as one of defamatory fact not entitled to absolute constitutional protection.

(2) *Are the statements capable of being objectively characterized as true or false?*

■ At the outset we note that if particular expression consists entirely of "pure opinion," it is not actionable and no further analysis is required. *Potomac Valve and Fitting, supra,* 829 F.2d at 1288. In the case before us, many of the statements in the Jennings column, such as those characterizing the development as "absolute insanity" and a "cockamamie idea" are pure opinion and absolutely protected by the First Amendment.

There are some statements in the column that might be read as factual. For example, Jennings stated that the development lies in the bad weather landing pattern of Williams Air Force Base and that the Air Force had warned that training jets would fly at 1600 feet over the development. On

a motion to dismiss, we must take these assertions to be false. In determining that the statements, though appearing to be factual, must be held to be within the First Amendment's protection, we consider the nature of the assertions and their relationship with the rest of the article. They are statements of underlying facts, not allegation of wrongful conduct *per se*. They form the premises of the column's argument that the city council had acted wrongly. They are therefore essential ingredients of political debate in its pristine form. We would be unwarranted in parsing the Jennings column so as to treat these statements differently from the rest of the article.

Many of the apparently factual statements in the column lacked precision and specificity. Assertions that people may have a difficult time conversing when aircraft are using the bad weather flight pattern and that residents will ultimately try to prohibit the Air Force from using the flight pattern are merely argumentative or are speculations that are not verifiable. *Presidio Enterprises, Inc. v. Warner Brothers Distributing*, 784 F.2d 674, 679–80 (5th Cir.1986). Individuals and newspapers alike are afforded absolute constitutional protection to voice spirited opinions on the "merits or demerits of a condition, cause or controversy, which is under public scrutiny." *Information Control Corp., supra*, 611 F.2d at 783.

The article did purport to recite certain "facts." But, as we have already indicated, those "facts" did not defame AMCOR and most are in the nature of predictions. In any event, merely because a commentary contains both opinion and alleged fact does not result in the article being actionable in tort. It is the rare commentary that will be totally devoid of supporting "facts" or premises. It is for this reason that most courts confronted with this issue appear to find no workable bright-line distinction between fact and opinion. In addition, it is important here that the primary target of Jennings' ire was the city council, not AMCOR. The fact that the statements as to the location of the bad weather landing pattern and the Air Force's warning might be verifiable does not justify ignoring the essential nature of the expression of which these statements were a part. *Scott v. News–Herald*, 25 Ohio St.3d 243, 496 N.E.2d 699 (1986).

The need for free and open debate on public issues and governmental action should not be chilled by rules requiring courts artificially to single out statements of fact and treat them in a vacuum, unrelated to the argument of which they are a part.

(3) *Does the context in which the alleged defamatory statements were made indicate that they were to be understood as argument rather than undiluted statements of fact?*

By context we mean here not only the internal structure of the writing in which the statements appear, but the place it occupies in the publication, as well as the wider social and political setting of the publication. On all these counts, the statements at issue clearly require protection as part of the public argument about an important public issue.

The article was a signed column carrying Max Jennings' name and photograph, the traditional format in American newspapers for columns of opinion and argument. It is labeled "Commentary" and is written in colloquial style, frequently in the first person. Jennings was identified as the executive editor of the *Mesa Tribune*. The column appeared on the editorial page of the newspaper under the heading "Opinion" in large, bold type. It ran directly under an editorial cartoon and is positioned to the right of an article entitled "Editorial" dealing with health care.

As the court in *Ollman* stated, the "Op–Ed page of a newspaper [is] the well-recognized home of opinion and comment." 750 F.2d at 990. The labeling of the article as "editorial" or "commentary" indicates that it constitutes opinion, *Information Control Corp., supra*, 611 F.2d at 784, even though such a label does not necessarily

make the statements contained therein constitutionally protected. *Ollman, supra,* 750 F.2d at 987 n. 33.

As indicated, the column criticized a decision of elected public officials regarding zoning, residential development, safety, and the quality of life in a city near an Air Force base. It is simply impossible that anyone reading this column would fail to perceive that they were reading arguments aimed at persuading them that several of the members of their city council had, in the opinion of the writer, made a serious mistake.

The factors applied here to determine whether the *Tribune* column is entitled to absolute protection constitute guidelines for approaching the problem, not a wooden "test." They require the court to balance all the factors in a particular case. The balancing must always be informed by acute awareness of the public's need, reflected in the Constitution, for free debate on public issues.

We affirm the trial court's dismissal of the complaint.

ROLL and LIVERMORE, JJ., concur.

APPENDIX

C2   Mesa, Arizona, Sunday, December 21, 1986

# Opinion

## Mesa Tribune

Cox Arizona Publications Inc.
DAVID C. SCOTT  President, Publisher

MAX JENNINGS   Executive Editor      CAROLINE JOHN  V.P., General Manager
SANDY SCHWARTZ  Managing Editor      PETER FRIEDRICH  Business Manager
THOMAS SHAPLEY  Editorial Page Editor   MARTIN CODY  Controller

### Editorial

# Health needs of poor not met in E. Valley

As long as you've got your health, the old saying goes, you've got just about everything. The other side of that coin may well be that if you don't have your health, you have just about nothing.

Here in the valley of success — where life is often measured in youth, health and vigor — those who fall ill or are injured and lack the means to pay for medical care can face a life quickly infected with a number of ills; physical, spiritual and economic.

In the third and final installment in a series examining the availability and extent of social services in the East Valley, today's Perspective section examines the issue of health care for those unable to pay for it.

Hard times can crush the soul and the spirit. When the body, too, is hit by injury or illness, the burden can be doubly crushing, especially in an area like the East Valley, where most are experiencing good times. Those in poverty are hardest hit when illness or injury compounds a lack of food, clothing and decent housing. Even for those seemingly out of reach of the grasp of poverty, a serious injury or lengthy illness can mean a slide into poverty.

A major issue facing this nation, this state and the communities of the East Valley is just what society's obligation is to those who have need of our increasingly sophisticated and expensive medical care but cannot afford to pay for it. As in other matters of help for the needy, the East Valley answer to health needs is too

often 'let 'em go to Phoenix.' While the Arizona Health Care Cost Containment System is struggling to bring health care to the needy in the East Valley, the best options are still in Phoenix.

Economic woes and medical ills can fuel a vicious cycle. It's difficult to make a living when one is ill or injured, and paying for medical care can quickly build tremendous financial burdens. Even those who have worked hard and diligently saved all their lives can find a lifetime of responsibility and thrift wiped out by illness and injury.

There are, simply put, too few health care facilities for the needy in the East Valley, leaving those who need health care little choice but to turn to Phoenix.

Surely we in the valley of success can manage the compassion, understanding and resources needed to care for the health and lives of our neighbors. A team of East Valley members from the public and private sector must work together to provide adequate health care for the citizens of these communities, to lobby for sufficient federal, state and county funds to do the job, to make sure that the East Valley is getting its share of these resources.

As in so many things, the true measure of the success of those who live in these East Valley communities may well lie in how well they care for the needs of their fellow humans. In treatment for alcohol abuse, in housing for the homeless, in health care for our neighbors, 'let 'em go to Phoenix' is no longer an acceptable answer

# Deafening development
## Homes, flight path make poor neighbors

The Mesa City Council has made perhaps its biggest mistake ever in approving a vast new high-density housing project under the screaming engines of Williams Air Force Base jets. The project, labeled as The Crossings, is the second-largest commercial development in city history

The 1,923-acre development will, in effect, be a new city. It will involve more than 3,600 homes, near the intersection of the Superstition Freeway and the proposed southeast loop freeway near Ellsworth Road in southeast Mesa.

There will be shopping, schools, a hotel — all the necessary things for people to live. In short, it's absolute insanity.

Williams Air Force Base officials already have warned that during bad weather they send as many as 150 jets a day over the area. The development lies directly beneath the base's bad-weather landing approach. In this respect, The Crossings is aptly named. Those jets are flown by student pilots, the most inexperienced the Air Force has. And, again, these flights over The Crossings will come, by definition, in bad weather, night and day — inexperienced pilots bringing in military aircraft in bad weather over a housing area.

Incredibly, the Air Force has warned that the T-37 and T-38 jet trainers will be only 1,600 feet high when they pass over the proposed housing and stores and schools of The Crossings. Most of us have an idea how much noise a jet makes at an airport taxiing to a gate. Imagine how much noise a military jet makes on a full throttle takeoff — and these are not whisper jets

Yeah, there's a reason why AMCOR Investments, Inc., a subsidiary of American Continental Homes, is going to make a killing on The Crossings. That land in the pathway of the Williams flights has not been worth very much, for obvious reasons. Now, almost overnight, it's already worth millions more, thanks to City Council approval of the project.

Of course the developer has eagerly agreed to add extra soundproofing. That was one of the requirements for approval by the council. Even with this expensive addition, the homes will be competitively priced because they are built on land that once was believed to be suitable only for agriculture

But who pays for soundproofing schools and police and fire stations? What do psychologists say about the effects of living in a high-noise environment? The homes may be soundproofed, but what about back yards and school playgrounds and churches? If there were only a few homes affected, it would be one thing. But now we're talking about an area that will house perhaps 10,000 or more.

## Max Jennings
Commentary

The only sign of mental activity on the part of some members of the City Council came Friday morning when some attention was given toward incorporating the land around Williams into the city's new master plan.

If this reasoning is not pursued, the people at Williams ought to start packing their bags right now. It may be the busiest fighter-training base in the Free World, but wait until thousands of taxpayers and voters start flexing their political muscle to complain about noise. It's inevitable It's happened elsewhere.

Council members Willie Wong, Keno Hawker and Peggy Rubach voted against The Crossings proposal, to their credit. I've got a suggestion for Dave Guthrie, Ross Farnsworth, Pat Blake and Mayor Al Brooks. They should drive out to The Crossings on one of Williams' bad-weather approach days, find a location where one of the thousands of homes will be built, and try to have a conversation. They'll find that the jets, one after the other, will produce 79 to 80 decibels. They'll find out they'll probably have to stop talking while each jet passes overhead — 150 times a day. But, as Guthrie points out, "We have to be fair to the developer in pursuit of planning and developing his property." He's got a point, I guess. If people are dumb enough to buy houses there, why not sell 'em to 'em?

It's the largest-scale case of caveat emptor I've ever seen Only thing I'm not sure of is whether it's buyer beware or Air Force beware Actually, it's city beware. Another cockamamie development in a city where the thought of planning a little more than a concept. The developers win another one; the quality of life consideration takes it on the chin again.

That's becoming the pattern these days. The only winner I can see in this sorry affair is AMCOR Investment Co., which is certainly doing exactly what it should be — making money.

*Max Jennings is executive editor of the Mesa Tribune.*

### Washington Merry-go-round

#### Petrodollars

In artistic circles, oil usually connotes the greasy stuff mixed with pigments that is daubed on canvas by would-be Rembrandts In Britain and Norway, however, oil — North Sea oil, that is — means big bucks for painters and sculptors

Money from the 1.5 million barrels of petroleum the two countries produce each day is steadily trickling down to their artists in the form of commissions for works to adorn government buildings, corporate headquarters and shopping malls. It's a modern version of the artistic flowering that accompanied the military and commercial successes of ancient Greece and Rome.

One example is the sculpture commissioned by the Norwegian government for its embassy here. It involved the shipment of a huge hunk of Scandinavian rock to Italy, where a Norwegian

sculptor hammered and chiseled it into shape It was then shipped to Washington. Petrodollars make such lavish expenditures on art possible

#### Oil dependency

For years Japan has been second only to the United States in energy consumption, yet a determined national effort has made the Japanese significantly less dependent on oil imports. Between 1973 and 1985, according to an expert's unpublished study, Japan's gross national product grew by about 44 percent, while its annual oil consumption dropped by 25 percent. By comparison, U.S. oil consumption dropped by less than half that amount during that period.

*Compiled by syndicated columnist Jack Anderson.*

### Berry's World

"I was just kidding, folks Actually, I think excessive violence in the NFL is really GREAT!"

### Quote, Unquote

"My God, we have really come full circle from the manger scene. In Bethlehem, the angels sang. (Sunday) night in Minneapolis the angels had to cry."

— Roman Catholic Archbishop John Roach, criticizing Minneapolis City Council member Barbara Carlson, who announced she is giving her children and friends condoms for Christmas to show concern about unwanted pregnancies and AIDS.

### Letter

# Blanket condemnation of developers unfounded

In response to your Nov 23 editorial, I wish to call your attention to an exception to your blanket condemnation of developers working with desert property

My name is Paul Riggs, a builder-developer in the Mesa area for 23 years. I came to Arizona from Ohio and was awestruck by the natural beauty of the state's unique terrain. My family and I, like most newcomers to the Valley, visited the mountains and foothills, panned for gold, admired all the various forms of vegetation, which we rarely knew the name, and, yes, got upset over the discarding of trash and beer cans along the traveled ways. We, like many others, had our pictures taken beneath the tall and stately saguaros.

I am now developing some of this unforgettable scenery into Mesa Desert Heights, a new subdivision located north of McDowell Road at 63rd and 64th streets between Recker Road and Bush Highway This project is situated in some of the most beautiful desert foothills in the state.

Unlike your description on the treatment of our natural environment by developers, I deliberately, with a great deal of extra effort and expense, placed streets and improvements to amongst the existing desert terrain. Through the cooperation of the Arizona Agricultural Department, we preserved all the healthy cactuses. We received permission from the city of Mesa, on our preliminary plan approval, to leave all lots in their natural

for the homes.

Every home in Mesa Desert Heights is and will be custom designed to fit the lot and to preserve as much of the desert growth and rock as possible. Our building design guidelines require each owner to venture the lot to its natural desert condition upon completion of home construction. We offer rock and desert plants to buyers purchasing a lot that required fill. We did have some areas in this project that needed fill due to flood plain areas, water flow spreading in all directions, engineered to flow into designed channels, thus eliminating those wash areas.

Max, I feel very deeply about preserving the natural beauty of our desert and also agree with you that there are developers looking for ways to save time and make more bucks, regardless of who it hurts or how many scars they leave. I just don't happen to be one of them. We spent countless hours and thousands of dollars designing our improvements to accommodate the desert.

Max, I invite you to come out and visit Mesa Desert Heights to see that signs of Arizona are still evident on improved hillside lots in a very beautiful area.

Thank you for your interest and concern in preserving the beautiful, fragile desert for the enjoyment of generations to come.

Paul E. Riggs, President
P & J Ventures, Inc.
Mesa