IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

JAMES T. HARRIS AND IHEARTMEDIA , INC.,
*Petitioners,*

*v.*

HON. RANDALL WARNER, JUDGE OF THE SUPERIOR COURT
OF THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,
*Respondent Judge,*

DANIEL MCCARTHY,
*Real Party in Interest.*

No. CV-21-0242-PR
Filed April 14, 2023

Appeal from the Superior Court in Maricopa County
The Honorable Randall H. Warner, Judge
No. CV2021-001785
**REVERSED AND REMANDED WITH INSTRUCTIONS**

Order of the Court of Appeals, Division One
No. 1 CA-SA 21-0193
Filed September 28, 2021

COUNSEL:

Marvin A. Glazer, Haynes and Boone, LLP, Palo Alto, CA; and Laura Lee
Prather (argued), Haynes and Boone, LLP, Austin, TX, Attorneys for James
T. Harris and iHeartMedia, Inc.

John J. Browder (argued), Michael H. Orcutt, Jennings Haug Keleher
McLeod, Phoenix, Attorneys for Daniel McCarthy

David J. Bodney, Matthew E. Kelley, Ballard Spahr LLP, Phoenix; and Gregg P. Leslie, Jacob M. Karr, Supervising Attorneys, Jolene Bryant, Chase Johnson, Chase MacKay, Evan Stele, Vanessa Stockwill, Rule 39(c) Certified Law Students, First Amendment Clinic Public Interest Law Firm, Sandra Day O'Connor College of Law, Arizona State University, Phoenix, Attorneys for Amici Curiae Arizona Broadcasters Association, Arizona Newspapers Association, and Reporters Committee for Freedom of the Press

---

JUSTICE MONTGOMERY authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, LOPEZ, BEENE, and KING joined.

JUSTICE MONTGOMERY, Opinion of the Court:

¶1        In this case, we consider whether certain statements made on air by a radio talk show host about a political figure may serve as a basis for a defamation action.   Given each statement's content, the overall context, and the protections afforded to core political speech by the First Amendment, we hold that the statements are not actionable.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

¶2        Petitioner James T. Harris hosts a radio show called *The Conservative Circus* on KFYI, a local radio station owned by Petitioner iHeartMedia, Inc. (collectively, "Petitioners").   Respondent Daniel McCarthy is a "Republican political hopeful" who attended a "Stop the Steal" rally protesting certification of the 2020 Presidential election results on November 7, 2020, at the Arizona State Capitol.   Harris also attended the rally and gave a speech.   Near the end of Harris' speech, several attendees at the rally began chanting for McCarthy who then also spoke. Subsequently, and over the course of two consecutive radio shows, Harris discussed his observations of McCarthy, McCarthy's recent campaign for the United States Senate, and his interactions with McCarthy's supporters at the rally.

¶3        McCarthy sued Petitioners, alleging that numerous statements made by Harris on *The Conservative Circus* were defamatory. Petitioners filed a motion to dismiss McCarthy's complaint pursuant to

Arizona Rule of Civil Procedure 12(b)(6), arguing that the statements were rhetorical hyperbole incapable of being proved false and protected by the First Amendment, and were therefore not actionable.

¶4        In its ruling on the motion to dismiss, the trial court noted that the statements addressed matters of public concern and that McCarthy was a public figure.   Turning to Harris' allegedly defamatory statements, the court found the majority were not defamatory.   Of nine that were potentially actionable, the court quoted them as follows with our enumeration:

> Statement (1): "McCarthy 'has absolutely no control over his emotions or the emotions of the people who are supposed to be supporting him.'"
>
> Statement (2): "The conduct of McCarthy's supporters at the rally 'was downright frightening because they were unhinged.'"
>
> Statement (3): "McCarthy and his supporters at the rally were 'acting like ANTIFA.'"
>
> Statement (4): "McCarthy 'surrounded himself' with 'thugs' and 'thuggish bodyguard types.'"
>
> Statement (5): "McCarthy 'attacked' Harris at the rally."
>
> Statement (6): "McCarthy's supporters 'got hostile' at the rally."
>
> Statement (7): "McCarthy and his supporters 'created something called the Guerilla Party.'"
>
> Statement (8): "McCarthy 'had an opportunity to dump more money into his campaign. He told people he would put a million dollars' into his campaign and he was 'nowhere close.'"
>
> Statement (9): "McCarthy 'didn't even have enough faith in his own voice to invest in it.'"

**¶5** The court found that Statements (1)–(6) could be actionable because a factfinder may conclude that "the gist" of what was said "was that McCarthy and his followers engaged in or threatened violence at the rally." Despite acknowledging that "[s]ome of these statements might not be actionable taken alone," the court reasoned that "the context of other statements could be construed as a factual description of McCarthy's conduct," namely that "McCarthy uses violence to achieve political objectives, or at least has violent impulses he cannot control."

**¶6** The court found Statement (7) could also be actionable because a "statement that McCarthy recently created a new political party . . . could be found to state a defamatory fact." Finally, because they were "capable of being proven true or false," the court concluded that Statements (8) and (9) could be actionable too. Petitioners sought special action relief from the trial court's decision in the court of appeals, which declined to accept jurisdiction.

**¶7** We granted review to determine whether the superior court erred in denying Petitioners' motion to dismiss, an issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## II. STANDARD OF REVIEW

**¶8** We review de novo the denial of a Rule 12(b)(6) motion to dismiss. *Mesnard v. Campagnolo ex rel. Cnty. of Maricopa*, 251 Ariz. 244, 248 ¶ 11 (2021). "Dismissal is appropriate only if a plaintiff 'would not be entitled to relief under any interpretation of the facts susceptible of proof' as a matter of law." *Id.* (quoting *Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶ 8 (2012)). We review a trial court's determination of a statement's capacity for defamatory meaning de novo as well. *Sign Here Petitions LLC v. Chavez*, 243 Ariz. 99, 106 ¶ 22 (App. 2017). In reviewing a defamation case, we are also mindful that courts serve as gatekeepers to ensure, especially in the context of political speech, "that only truly meritorious defamation lawsuits are allowed to proceed." *Rogers v. Mroz*, 252 Ariz. 335, 338 ¶ 4 (2022).

**¶9** Our review of allegedly defamatory statements concerning public matters is further characterized as an "enhanced appellate review," *id.* at 340 ¶ 20 (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990)), where

"we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964) (citation omitted) (internal quotation marks omitted) (alteration in original).

## III.  DISCUSSION

### A.  Defamation And The First Amendment

¶10        McCarthy argues each of the nine statements is actionable because they can be reasonably interpreted as asserting or implying false statements of fact that defamed him.   Harris contends the statements constitute political speech protected by the First Amendment.[1]

¶11        Generally, for a public figure to bring a defamation claim, the plaintiff must allege (1) the defendant made a false statement concerning the plaintiff, (2) that is defamatory, (3) published to a third party, (4) made with actual malice, and (5) that the plaintiff was damaged as a result of the statement.   *Morris v. Warner*, 160 Ariz. 55, 62 (App. 1988).   "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation."   *Turner v. Devlin*, 174 Ariz. 201, 203–04 (1993) (quoting *Godbehere v. Phx. Newspapers, Inc.*, 162 Ariz. 335, 341 (1989)).

¶12        In *Rogers*, this Court canvassed Arizona and United States Supreme Court precedent to conclude further that in order "to establish a defamation claim on matters of public concern: (1) the assertion must be provable as false; [and] (2) the statement must be reasonably perceived as

---

[1] Harris also generally references the "Arizona Constitution" but does not cite to any specific provision nor does he develop any argument based on state constitutional protections.   We therefore deem this argument waived.   *See State v. Bolton*, 182 Ariz. 290, 298 (1995) ("Failure to argue a claim on appeal constitutes waiver of that claim."); *see also* Ariz. R.P. Spec. Act 7(e) (providing that petition for special action shall include "an argument containing the petitioners' contentions with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and appropriate references to the record").

stating actual facts about an individual, rather than imaginative expression or rhetorical hyperbole." 252 Ariz. at 341 ¶ 22.

¶13 With respect to the statements challenged by McCarthy, we "carefully examine every alleged defamatory statement," *Yetman v. English*, 168 Ariz. 71, 79 (1991), and analyze them within their proper context to determine their meaning, *Rogers*, 252 Ariz. at 342–43 ¶¶ 31–32; *accord AMCOR Inv. Corp. v. Cox Ariz. Publ'ns, Inc.*, 158 Ariz. 566, 570 (App. 1988) ("[C]ourts give great weight to the context in which the statements are made."). Understanding a statement in context is "even more important" when the speech relates to issues of public concern. *Rogers*, 252 Ariz. at 342 ¶ 31. "Indeed, context may well be dispositive" in such cases. *Id.* Additionally, in deciding whether a statement is actionable, "[t]he key inquiry is whether the challenged expression . . . would reasonably appear to state or imply assertions of objective fact." *Yetman*, 168 Ariz. at 76 (emphasis omitted) (quoting *Immuno AG. v. Moor–Jankowski*, 567 N.E.2d 1270, 1273 (N.Y. 1991)). We "cannot stop at literalism," but must "'consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person' at the time the statement was uttered and under the circumstances it was made." *Sign Here Petitions*, 243 Ariz. at 105 ¶ 21 (emphasis omitted) (quoting *Yetman*, 168 Ariz. at 76). We do this not with the "critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average [listener]." *Yetman*, 168 Ariz. at 77 (alteration in original) (quoting *MacLeod v. Tribune Publ'g Co.*, 343 P.2d 36, 41–42 (Cal. 1959)).

## B. The Challenged Statements

¶14 With the foregoing in mind, we consider each challenged statement (in bold) set forth in context:

Statement (1): "Someone needs to tell Daniel McCarthy that he – if he's running for office, he has disqualified himself, because no one in the world would ever decide to support a guy who has **absolutely no control over his emotions or the emotions of the people who are supposed to be supporting him**."

Statement (2): "Someone needs to tell Daniel McCarthy that he – if he's running for office, he has disqualified himself because no one in

the world would ever decide to support a guy who has absolutely no control over his emotions or the emotions of the people who are supposed to be supporting him. What I saw on Saturday **was downright frightening because they were unhinged.**"

Statement (3): "Dr. Ward's daughter was in the audience, and they – they went – they said some of the most crazy, out world, just – and I went over, I'm like, are you okay? She was visibly shaken, angry. These lunatics – look. When we have these kind of events, we need to make sure that we are not down there **acting like ANTIFA.** We need to make sure we're not acting like BLM. We need to be better than them or we will cannibalize our own movement."

Statement (4): "What I saw out there on Saturday from Daniel McCarthy and his – his thugs was disturbing. And based on what I saw down at the Capitol, people are going to remember this. They're going to remember him as the guy who **surrounded himself with thuggish bodyguard types.**"

Statement (5): "Why would a guy who claims to have so much money and time attack fellow conservatives if in fact he's a conservative? Other than his rhetoric, there's no evidence of that whatsoever. Why would he make a public spectacle of himself and **go on the attack, attacking** the very few people who are on the same side of the political aisle?"

Statement (6): "And I said to them, one of the guys, I'm like, dude, is this real? Are you serious? Are you seriously trying to take this microphone away – away from me? Then it **got hostile** as they were trying to get the microphone from the woman who had organized the event, and other people were just not having it."

Statement (7): "Let's talk about the impact of this behavior. You said subversive and divisive. In the last 24 hours, less than, I heard that they **created something called the Guerilla Party.** The Guerilla Party. I can't see how that would help the Conservative cause."

Statement (8): "**He had an opportunity to dump more money into his campaign.   He told people he would put a million dollars,** and I'm hearing **he was** nowhere – nowhere – **nowhere close.**"

Statement (9): "He had an opportunity to dump more money into his campaign.   He told people he would put a million dollars, and I'm hearing he was nowhere – nowhere – nowhere close.   **Daniel McCarthy didn't even have enough faith in his own voice to invest in it.**"

## C.   Analysis Of Statements (1)–(6) And (9)

¶15       McCarthy argues that statements (1)–(6) and (9) expressed verifiable assertions of fact because Harris was reporting on what happened to him at the rally and that each statement defamed him.   Harris argues statements (1)–(6) are not actionable because they are Harris' personal impressions and subjective criticisms of McCarthy's conduct at the rally and are therefore incapable of verification.   Similarly, he argues that statement (9) does not assert an objective, verifiable fact.

¶16       Statements containing "loose, figurative, or hyperbolic language" tend to negate the implication that they convey objective facts. *Milkovich*, 497 U.S. at 21; *see also Turner*, 174 Ariz. at 208 (finding alleged defamatory statements to be "unmistakably exaggeration" and "not an assertion of fact").

¶17       We readily conclude statements (1)–(6) and (9) are not actionable.   Each statement either cannot be reasonably interpreted as a factual assertion, is not provable as false, or both.   Given the overtly political context, tone, and general purpose of *The Conservative Circus*, statements such as: McCarthy has "absolutely no control over his emotions"; conducted himself in a manner that was "downright frightening" and "unhinged"; was "acting like ANTIFA"; surrounded himself with "thugs"; went "on the attack, attacking" others; "it got hostile"; and that he "didn't even have enough faith in his own voice" are all readily recognized as rhetorical political invective or mere hyperbole and not statements or implications of objective fact.   *See Yetman*, 168 Ariz. at 77 (noting that statements are not actionable "[i]f interpreted as nothing more than rhetorical political invective"); *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970) (holding the term "blackmail" nonactionable

because it was used as "no more than rhetorical hyperbole," and "a vigorous epithet").

¶18       Furthermore, Harris' commentary is overwhelmingly characterized by his personal and subjective impressions, lacking any objective criteria by which to measure its falsity.   *See, e.g.*, *Turner*, 174 Ariz. at 207 ("We can conceive of no objective criteria that a jury could effectively employ to determine the accuracy of [the statements].").   Thus, even if some of these statements might be construed as assertions of fact, it is impossible to prove whether they are true or false, which is necessary for a defamation action.   *Id.* at 205 ("A statement regarding matters of public concern must be provable as false before a defamation action can lie.").

¶19       For example, Harris stated in Statement (2), "What I saw on Saturday was downright frightening because they were unhinged."   Such a statement cannot be measured by any objective criteria for determining whether McCarthy's conduct was in fact "downright frightening" to Harris and "unhinged" because it reflects Harris' subjective impressions.   In Statement (9), Harris claimed that McCarthy "didn't even have enough faith in his own voice to invest in it."   Again, determining whether McCarthy did or did not have enough faith in his own voice to invest in his campaign "is not the kind of empirical question a fact-finder can resolve." *Yetman*, 168 Ariz. at 81.   And, as for Statement (5), the assertion that McCarthy was "attacking other people" cannot be reasonably interpreted as referring to physical action when read in context.   Rather, it is fairly understood as Harris' subjective characterization of McCarthy's speech that cannot be measured by any objective criteria.   Statements (1), (3), (4), and (6) fare likewise.   Thus, any comments that could reasonably be interpreted as assertions of fact are still not provable as false.

## D.   Analysis Of Statements (7) And (8)

¶20       McCarthy argues Statements (7) and (8) are actionable because stating that he had created a new political party and told people he would put a million dollars into his campaign are verifiable assertions of fact.   Along with arguing that Statements (7) and (8) are not reasonably interpreted as objective, verifiable facts, Harris also argues that statements regarding the creation of a new political party or political contributions are incapable of defamatory meaning as a matter of law.

¶21        In Statement (7), Harris commented that McCarthy and his supporters "created something called the Guerilla Party."[2]   McCarthy alleges this statement harmed his reputational interest because it portrayed him as dangerous and disloyal to the Republican Party.   We reject this claim because the mere assertion that McCarthy created a new political party is not defamatory.

¶22        Nothing about forming a new party, a constitutional right, would bring McCarthy "into disrepute, contempt, or ridicule," or impeach his "honesty, integrity, virtue, or reputation."   *Godbehere*, 162 Ariz. at 341. And, in context, Harris' point was simply that McCarthy was not helping the conservative cause, a matter not capable of being proved false.   *See, e.g.*, *Frinzi v. Hanson*, 140 N.W.2d 259, 262 (Wis. 1966) ("The degree of allegiance one has to a political party is not libelous."); *Sheridan v. Davies*, 31 P.2d 51, 53 (Kan. 1934) (holding the charge of "disloyalty to a certain faction in [a political] party" not defamatory).

¶23        With respect to Statement (8), McCarthy argues that Harris stating "[McCarthy] told people he would put a million dollars" into his campaign but that he was "nowhere close" is defamatory because it impugned his honest character.[3]   We do not find this statement defamatory.   While provable as false—McCarthy could show he never told anyone he would put any particular amount of money into his campaign, or that he actually did put a million dollars into it—the entire context of the statement does not impeach his integrity.

---

[2] The parties disagree on whether Harris said, "*Gor*illa Party," or "*Guer*illa Party."   The actual term used is not dispositive to our resolution.   Even if Harris used the phrase "Guerilla Party," given the context of the political talk show no reasonable listener would have understood Harris as insinuating that McCarthy uses violent, insurrectionist tactics to meet political ends.   *Rogers*, 252 Ariz. at 337 ¶ 1 (concluding no defamation where "the asserted implication is not one that would likely be drawn by a reasonable listener").   Therefore, we only consider this statement in the most general sense suggesting that McCarthy created a new political party.

[3] Harris asks us to take judicial notice that McCarthy did not, in fact, contribute a million dollars to his political campaign.   We decline to do so because it does not address whether McCarthy "told people" that he would contribute that amount.

¶24            Under the First Amendment, apparently factual statements must be considered in light of the nature in which the speaker uttered them and the relationship of the statements to the overall context.   *AMCOR*, 158 Ariz. at 571.   Here, the nature of the words is colored by the context of an overtly political talk show.   Harris, the self-proclaimed "ringmaster," describes *The Conservative Circus* as "political commentary and opinion told in an entertaining manner from one side of the political spectrum."   When listeners tune into *The Conservative Circus*, they thus expect to hear political commentary offered by Harris that reflects his opinion "in an entertaining manner."   Such is the essence of radio talk shows today.   *See, e.g.*, *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157 (9th Cir. 2021) (recognizing that "the broad context of Maddow's show makes it more likely that her audiences will 'expect her to use subjective language that comports with her political opinions'" (quoting *Herring Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042, 1050 (S.D. Cal. 2020))); *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 184 (S.D.N.Y. 2020) ("[O]verheated rhetoric is precisely the kind of pitched commentary that one expects when tuning in to talk shows like Tucker Carlson Tonight . . . ."). And, as the court in *AMCOR* recognized, "merely because a commentary contains both opinion and alleged fact does not result in [it] being actionable in tort.   It is the rare commentary that will be totally devoid of supporting 'facts' or premises." 158 Ariz. at 571.

¶25            Additionally,   the   statement   involves   political   speech concerning the actions of a candidate.   The United States Supreme Court has emphasized the "vast" importance and "great" advantages of speech "discuss[ing] the character and qualifications of candidates" for political office.   *Sullivan*, 376 U.S. at 281 (quoting *Coleman v. MacLennan*, 98 P. 281, 286 (Kan. 1908)); *accord Mills v. Alabama*, 384 U.S. 214, 218 (1966) (noting that "a major purpose" of the First Amendment is "to protect the free discussion of governmental affairs," including "discussions of candidates").   Thus, "[t]he need for free and open debate on public issues and governmental action should not be chilled by rules requiring courts artificially to single out statements of fact and treat them in a vacuum, unrelated to the argument of which they are a part."   *AMCOR*, 158 Ariz. at 571.

¶26            Failing   to   carry   through   with   an   original   intention   to contribute a certain sum to one's campaign does not presume or even necessarily suggest that McCarthy was lying.   In context, Harris simply stated that McCarthy didn't have enough trust in his campaign to

11

contribute as much as he allegedly "told people" he would. That is more readily perceived as political commentary regarding the perceived strength of a candidate's campaign than a statement of objective fact.

¶27 Harris uttered Statements (7) and (8) in the context of two separate episodes, spanning over two hours of political commentary centering on his appeal for party unity and his view that McCarthy was undermining that goal. Although in isolation these statements might be read as assertions of verifiable fact, their nature and full context render them not defamatory. *See Rogers*, 252 Ariz. at 340 ¶ 19 (recognizing that in *Greenbelt*, "an assertion that ordinarily could bear a defamatory meaning, and that could be proven false, was deemed nonactionable under the First Amendment because the context demonstrated, as a matter of law, that it was a hyperbolic comment made during a charged public hearing on a matter of public concern"); *see also Maddow*, 8 F.4th at 1160 (stating that even though the statement "taken in isolation" was "capable of verification," the context established it as a nonactionable opinion (quoting *Maddow*, 445 F. Supp. 3d at 1054)).

¶28 Therefore, the nature of Statements (7) and (8) and the context in which they were made during *The Conservative Circus* negate the allegation that Harris asserted objective, defamatory facts. *See McDougal*, 489 F. Supp. 3d at 183–84 ("This 'general tenor' of the show should then inform a viewer that he is not 'stating actual facts' about the topics he discusses and is instead engaging in 'exaggeration' and 'non-literal commentary.'" (quoting *Milkovich*, 497 U.S. at 20–21)).

¶29 In the context of political talk radio today and what passes for public discourse, statements will be made where in the past an appreciation for measured and thoughtful discussion and for one's reputation as a responsible purveyor of political opinion may have otherwise precluded them. *See, e.g., Yetman*, 168 Ariz. at 77. Yet, the "standards of defamation necessarily fluctuate with the vicissitudes of time and public opinion." *Id.*; *accord Rogers*, 252 Ariz. at 341 ¶ 22 n.2 ("[P]olitical discourse has devolved over the past three decades. Terms that once conveyed powerful invective such as 'communist,' 'socialist,' 'fascist,' and even 'traitor' are commonplace in current political discourse, cheapening their pejorative impact and becoming almost synonymous with 'someone with whom I disagree.'").

**¶30** However, we do not suggest that the First Amendment provides categorical protection to anything that may be said on a political talk show. *See, e.g.*, *Rogers*, 252 Ariz. at 338 ¶ 3 ("Candidates cannot make defamatory assertions they hope voters will believe, then, when sued for defamation, seek refuge in the defense that no one believes what politicians say."). For political speech to ultimately serve the interests of public discourse in a constitutional republic, it is fitting to recall the words of George Washington: "In proportion as the structure of a government gives force to public opinion, it is essential that public opinion should be enlightened." George Washington, Farewell Address (Sept. 19, 1796).

## IV. DISPOSITION

**¶31** We reverse the trial court's ruling and remand with instructions to dismiss McCarthy's complaint with prejudice.

**¶32** Both parties seek attorney fees under A.R.S. § 12-349 but neither explains why they are entitled to such an award. Lacking an obvious reason for granting attorney fees under the statute's enumerated provisions, we decline the parties' requests.