IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

WENDY ROGERS and HAL KUNNEN, husband and wife, and
WENDYROGERS.ORG, a principal campaign committee,
*Petitioners*,

v.

THE HONORABLE ROSE MROZ, Judge of the SUPERIOR COURT OF
THE STATE OF ARIZONA, in and for the County of MARICOPA,
*Respondent Judge*,

PAMELA YOUNG, an individual;
MODELS PLUS INTERNATIONAL, L.L.C. d/b/a THE YOUNG
AGENCY, an Arizona limited liability company,
*Real Parties in Interest*.

No. 1 CA-SA 19-0262
FILED 12-8-2020

Petition for Special Action from the Superior Court in Maricopa County
No.  CV2018-013114
The Honorable Rosa Mroz, Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED;
REVERSED**

---

COUNSEL

Greenberg Traurig, LLP, Phoenix
By E. Jeffrey Walsh, Dominic E. Draye, Robert A. Hill
*Counsel for Petitioners*

Tiffany & Bosco, PA, Phoenix
By William M. Fischbach, III, Amy D. Sells, Marcos A. Tapia
*Counsel for Real Parties in Interest*

---

**OPINION**

---

Presiding Judge David D. Weinzweig delivered the opinion of the Court, in which Judge David B. Gass joined. Judge Kent E. Cattani dissented.

---

**W E I N Z W E I G**, Judge:

**¶1**        Our constitutional democracy preserves and protects the fundamental rights of free speech and free association. This is especially true in elections, when voters need more information about the candidates who seek to represent them and candidates have nothing but words and ideas in their political contest for hearts and minds. At issue in this defamation action are two political attack ads published by one candidate against her political opponent in a heated congressional primary, which later caused the second candidate's employer to sue the first candidate and her campaign for defamation and false light. We must determine whether the employer presented enough evidence at summary judgment for reasonable persons to find, with convincing clarity, that the attack ads implied the employer and its founder either committed or supported sex crimes.

**¶2**        Wendy Rogers, Hal Kunnen and Wendy Rogers for Congress (collectively, "Rogers") petition for special action relief to reverse the superior court's denial of their motion for summary judgment on the defamation and false light claims of Pamela Young and the Young Agency (collectively, "Young"). We previously accepted jurisdiction and granted relief, reversing the superior court and promising an opinion to follow. This is that opinion.

**FACTS AND PROCEDURAL BACKGROUND[1]**

**I.        Steve Smith: The Talent Agent**

**¶3**        Steve Smith joined the Young Agency as a talent agent in 2007. Based in Phoenix, the Agency represents models, actors and talent of all ages, "ranging from newborn to ninety." Child models comprise around 50 percent of the Agency's modeling clients. Pamela Young founded the

---

[1]   We recount the evidence in the light most favorable to Young, the non-movant at summary judgment. *Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken*, 179 Ariz. 289, 293 (App. 1994).

Agency and owns it.  A "former model and actor" herself, Young authored a how-to book for child models in 2015 with "secrets" and "tips" to achieve success.  Pamela Young, *How to Become a Kid Model: Secrets & Tips to Skyrocket Your Career!* (2015).

**¶4**         ModelMayhem.com ("Model Mayhem") is an internet-based platform and professional marketplace for the modeling industry.  Steve Smith said the website was "considered by many as an industry place where all folks in the industry would go if they needed talent."  In that spirit, Smith created a "Modeling Agent" profile on ModelMayhem.com and similar websites.  Smith's profile featured the Agency's logo and described the Agency as "one of the largest Model and Talent Agencies in the [southwest]."

**¶5**         Over the years, Model Mayhem acquired a sketchy reputation as a platform for sex criminals and some users accused the website's owners of failing to warn them "the site had been used for sex trafficking."  ABC News released a story in March 2013 on the "dangerous history" of Model Mayhem, "the website that promises to connect aspiring models with the people who can help rocket them to fame."  Evan Millward, *Modeling Website Linked to Disappearances, Rape and Human Trafficking*, ABC News (May 6, 2013).[2]  The article reported Model Mayhem was "being investigated for its role in the disappearance, rape and trafficking of more than a dozen women across the country."  The reporter interviewed three sources for the article—a model, a photographer and a police detective.  All three shared a concern about sexual predators lurking in the dark corners of ModelMayhem.com, waiting for easy prey.  The National Women's Coalition Against Violence and Exploitation "said it can connect a dozen missing girls nationwide to the website."

**¶6**         The ABC News reporter briefly touched upon one victim's nightmare as gleaned from her failure-to-warn lawsuit against Model Mayhem's owners.  The victim "alleged she was drugged and raped on video [and] that Model Mayhem knew the two men had been committing these crimes to other women across the country and did not stop them or warn users on the site."  The article said the lawsuit had been "thr[own] out" in 2012, "but an appeal [was] working its way through the judicial system in California."  The victim later dismissed the appeal, voluntarily, which the article did not reflect.

---

[2]  The article is available at https://abc17news.com/news/modeling-website-linked-to-disappearances-rape-and-human-trafficking/20037496 (last visited on Oct. 10, 2020).

## II.    Steve Smith: The Candidate

**¶7**        Steve Smith lived a parallel life in state politics, moonlighting as a state representative and state senator, a common phenomenon in states with part-time legislatures and legislators.  Smith was first elected to the Arizona legislature in 2010.  From there, he won elections in 2012, 2014 and 2016.  Therefore, Smith was a seasoned, undefeated politician when he turned his attention to higher office in 2018.

### A.    2018 Congressional Race

**¶8**        Smith ran for Congress in 2018, hoping to represent Arizona's First Congressional District in Washington, D.C.  He faced two candidates in the Republican primary, including Wendy Rogers, for the privilege to run against incumbent Congressman Tom O'Halleran, a Democrat, in the general election.  Rogers was a seasoned candidate, like Smith, with several elections under her belt, but, unlike Smith, she had never won a general election.

**¶9**        By all accounts, the campaign was spirited, combative and sometimes unpleasant.  Rogers deployed an aggressive multimedia front intended to dismantle Smith's character with questions about his moral fitness.  Rogers accused Smith of hiding his longtime day job from voters to protect his holographic image as the "pro-traditional family values" candidate.  She pressed this hand-crafted narrative in television and radio ads, mailers and a dedicated website.  Young contends Rogers defamed her and the Agency in two campaign publications.

**¶10**        <u>The radio ad</u>.  The first alleged defamation was uttered over the radio by a "narrator [speaking] in a grave and cautious tone" with "creepy audio effects" in the background.  The full ad is transcribed here with the alleged defamation italicized:

> Tom O'Halleran is a dangerous leftist and ally of Nancy Pelosi and the open borders lobby, but he'll win again if we run Steve Smith for Congress. *Smith is a slimy character whose modeling agency specializes in underage girls and advertises on websites linked to sex trafficking.* Smith opposed Trump, never endorsed Trump against Clinton and ridiculed our much needed border wall.
>
> Who'll beat O'Halleran? Wendy Rogers. Wendy Rogers strongly supports President Trump and the President's conservative agenda. Wendy Rogers is a decorated Air Force

4

pilot, small business owner, and major supporter of President Trump's border wall. Slimy Steve Smith can't beat O'Halleran and the anti-Trump left. Only Wendy Rogers will.

Wendy Rogers for Congress. Conservative, Republican, standing with President Trump, standing with us. I'm Wendy Rogers and I approve this message.

¶11            The campaign blog. Rogers posted the second statement on her campaign's website, *www.slimysteve.com*, which teemed with harsh criticism of Steve Smith. This website included blog posts titled "Steve Smith's Campaign Attacks, Associations Demonstrate Hypocrisy," "Steve Smith Endorsed Ted Cruz," "Steve Smith Sponsored an Anti-Gun Bill," and "This Arizona Congressional Candidate Threw Pres. Trump's Wall Under the BUS."

¶12            The challenged statement appeared in a post titled "Steve Smith is a Director for a Modeling Agency that Recruits Children and Advertises on Sites with Playboy Models." The post chided Smith for concealing from voters "the job he's held for the last twelve years." It also purported to recite "facts" about Smith's job in bullet-point form. In this lawsuit, Young complained about the second-to-last bullet point, as shown in this screenshot, which also depicts the last point and emphatic takeaway:

> - Further, Steve Smith personally advertises on the website, Model Mayhem, a website full of pornographic material, which has also been involved in human trafficking, according to ABC News, and has been reported as having a "dangerous history."
> - Anti-Human Trafficking Groups Partner Together Against Model Mayhem Where Steve Smith Advertises
>
> **Steve Smith is a FAKE and is NOT the pro-traditional family values candidate that he claims to be!**

¶13            For her part, Rogers later explained she published both campaign ads to "shine a light on the character of [her] opponent and with whom he associates," enabling "the voter to decide" whether Smith "had bad character." Rogers ultimately prevailed in the primary election, defeating Smith by a narrow margin. She then lost the general election.

### B.    This Lawsuit

**¶14**        During the primary campaign, Pamela Young learned about the attack ads and "told Smith to keep the Young Agency out of the controversy."  Smith threatened to sue Rogers over the negative ads.

**¶15**        After the election, Young did what Smith had threatened.  She sued Rogers in state court for defamation and false light invasion of privacy, alleging the campaign ads implied Young had committed or supported the commission of sex crimes, and demanded presumed, special, general and punitive damages.  Rogers answered, denying liability.

**¶16**        Discovery started.   Young requested a broad range of financial records from Rogers in relation to the punitive damages claim, including bank records, tax returns, deeds, financial statements, business interests and more.   To avoid disclosing her financial records and information, Rogers moved for summary judgment on all claims, arguing (1) "the First Amendment bars claims for defamation and false light based on truthful statements about a matter of public concern," (2) Young "could not support the proposed defamatory meaning when faced with the high threshold for defamation by implication," and (3) "even if the allegedly defamatory statements were false or the implied defamatory meaning met the test for implied defamation, [Rogers] did not make the statements with requisite constitutional 'actual malice.'"

**¶17**        Young countered that summary judgment was improper because Young was not a public figure and actual malice was unnecessary. Young also clarified which statements in the above campaign ads supported her defamation and false light claims, describing their implied defamatory meaning as follows:

- Implied defamation.  "By asserting that The Young Agency advertised on a website 'linked to sex trafficking' or 'involved in human trafficking,' Rogers insinuated that The Young Agency aided or was complicit in those crimes [because] '[a]dvertising' on something is often seen as 'support' of something."

- Defamatory meaning.  Young argued the radio ad was "capable bearing the defamatory meaning . . . that The Young Agency was purportedly complicit in sexual misconduct with 'underage girls' and aided, or was complicit, in 'sex-trafficking,'" adding that "[t]he intent and meaning of the [radio] message [was] clear. Steve Smith is a slimy character.  Why?  Because his modeling agency, The Young

Agency, (1) 'specializes in underage girls' and (2) 'advertises on websites linked to sex trafficking' or 'involved in sex trafficking.'"

¶18 The superior court denied Rogers' motion for summary judgment in a four-sentence minute entry without oral argument, explaining: "The Court agrees with Plaintiffs' arguments." Rogers petitioned this court for special action relief to reverse the superior court's denial of summary judgment.[3]

## SPECIAL ACTION JURISDICTION

¶19 Special action jurisdiction is rarely appropriate to review the denial of summary judgment, *Scottsdale Pub. Inc. v. Superior Ct.*, 159 Ariz. 72, 74 (App. 1988), but we may accept jurisdiction "when a suit raises serious First Amendment concerns," threatens to chill protected speech and may be resolved as a matter of law, *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 516, ¶¶ 8-9 (2005).

¶20 Rogers argues we should accept special action jurisdiction because Young's defamation claim, if allowed past summary judgment, would chill future politicians from introducing an opponent's occupation or business practices into future elections, fearing the campaign criticism might inferentially concern the opponent's employer and lead to personal civil liability. Young counters that special action jurisdiction is not warranted because her claims do not concern the First Amendment's freedom of press.

¶21 We accept special action jurisdiction, which is appropriate here for the same reasons discussed in our freedom of press jurisprudence. *See, e.g.*, *Miller*, 210 Ariz. at 516, ¶ 8. After all, freedom of speech under the First Amendment "has its fullest and most urgent application" in "campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). And the First Amendment affords no greater protection to the institutional press. *Obsidian Fin. Group, LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) ("[E]very other circuit to consider the issue has held that the First Amendment defamation rules in *Sullivan* and its progeny apply equally to the institutional press and individual speakers.").

---

[3] Rogers also filed an Emergency Motion to Stay Discovery of Their Finances Pending Resolution of Petition for Special Action on December 23, 2019, which is denied as moot.

**STANDARD OF REVIEW**

**¶22**　　　　We review de novo the superior court's denial of summary judgment on the record presented to ensure the court has not made a "forbidden intrusion on the field of free expression." *Scottsdale Pub.*, 159 Ariz. at 82 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)).

**¶23**　　　　Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Ariz. R. Civ. P. 56(c)(1), and should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense," *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990).

**DISCUSSION**

**I.　　State Defamation Law and the First Amendment**

**¶24**　　　　A private person suing for defamation must prove a defendant (1) published a false and defamatory statement concerning the person, (2) knew the statement was false and defamed the other, and (3) acted in reckless disregard of these matters or negligently failed to ascertain them. *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 315 (1977) (citing Restatement (Second) of Torts § 580B (1975); *Reynolds v. Reynolds*, 231 Ariz. 313, 317, ¶ 8 (App. 2013) (quoting *Dube v. Likins*, 216 Ariz. 406, 417, ¶ 35 (App. 2007)).  The "publication must reasonably appear to state or imply assertions of material fact that are provably false." *Yetman v. English*, 168 Ariz. 71, 76 (1991).[4]

**¶25**　　　　The First Amendment limits state law defamation actions with an organic and "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and

---

[4]　　We assume without deciding that Young and the Agency are private persons for defamation purposes.  Rogers argues that Young is a limited purpose "public figure" who must prove actual malice because anything less would sanction "an attempted end-run around the Constitution," empowering a candidate's friends and employers to easily accomplish second-hand what the candidate manifestly could not.  We acknowledge the argument and concern but need not reach the issue because Young did not meet the summary judgment standard for non-public figures on issues of public concern.

[might] include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270; *accord Knievel v. ESPN*, 393 F.3d 1068, 1075 (9th Cir. 2005) (warning that "states tread perilously close to the limits of their authority" when "enforcing laws that impose liability for mere speech, a right explicitly guaranteed to the people in the United States Constitution"). Of "fundamental importance [under the First Amendment is] the free flow of ideas and opinions on matters of public interest and concern," *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988), which form "the essence of self-government," *Garrison v. La.*, 379 U.S. 64, 74-75 (1964), implicating the highest of "First Amendment values," *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1980).

### A. First Amendment Protections for Speech on Matters of Public Concern

¶26 "[S]ignificant constitutional protections" are particularly warranted when private persons sue for defamation arising from speech of public interest and concern. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 16 (1990). *Milkovich* outlined four relevant "protections" against First Amendment concerns.

¶27 First, an appellate court must "independent[ly] examin[e]" the entire record to ensure a "judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union, Inc.*, 466 U.S. 485, 499 (1984); *accord Yetman*, 168 Ariz. at 79. "Given the rigorous scrutiny required by the first amendment," courts must "carefully examine every alleged defamatory statement and rigorously apply the *Milkovich* standards to ensure that first amendment concerns are protected." *Yetman*, 168 Ariz. at 79. We have done so here.

¶28 Second, the plaintiff must affirmatively prove the falsity of an alleged defamatory statement. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986); *see also Miller*, 210 Ariz. at 517 (2005) ("When speech is about a matter of public concern, state tort law alone cannot place the speech outside the protection of the First Amendment."). Although this requirement "will insulate from liability some speech that is [unprovably] false," the burden is justified in ensuring speakers can address matters of public concern without "fear that liability will unjustifiably result." *Hepps*, 475 U.S. at 777-78.

¶29 Third, the plaintiff must prove that the alleged defamatory statement asserts or implies an objective, verifiable defamatory fact. *Milkovich*, 497 U.S. at 20. A statement is not actionable when the speaker

9

expresses a subjective view, an interpretation, a theory, conjecture or surmise. *Id.* at 17-21.

¶30 Fourth, a private person may not recover punitive damages "on less than a showing of [actual] malice" for speech on matters of public concern. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974); *accord Scottsdale Pub. Co.*, 159 Ariz. at 82.

¶31 Arizona courts have applied another coat of "constitutional protection" by exacting a "higher burden" from defamation plaintiffs to defeat a defense motion for summary judgment. *Sign Here Petitions LLC v. Chavez*, 243 Ariz. 99, 104, ¶ 15 (App. 2017). A plaintiff must present evidence in the summary judgment record "sufficient to establish a prima facie [defamation] case with convincing clarity." *Id.* This requirement "is rooted in the notion that the expense of defending a meritless defamation case could have a chilling effect on First Amendment rights." *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 356 (1991). Clear and convincing evidence requires "the thing to be proved is highly probable or reasonably certain." *Gila River Indian Cmty. v. Dep't of Child Safety*, 238 Ariz. 531, 537 (App. 2015).

### B. Campaign Speech is of Public Concern

¶32 At issue here are two statements of a candidate aimed squarely at her political opponent's moral fitness. Campaign speech represents the purest form of speech on public concern. *Brown v. Hartlage*, 456 U.S. 45, 53 (1982) ("The free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy — the political campaign.").

¶33 The First Amendment safeguards an open, unvarnished clash of ideas and narratives from candidates of all stripes for consumption by voters when deciding which candidate most resembles or embodies their beliefs and ideals. *Secrist v. Harkin*, 874 F.2d 1244, 1249 (8th Cir. 1989) ("While political commentators often decry the 'low level' of campaign tactics or rhetoric, the debate which accompanies public examination of candidates for public office lies at the very heart of the First Amendment and is essential to our democratic form of government.").[5] And even

---

[5] The dissent contends the majority's opinion "essentially creates a limitless license to lie," but, from the First Amendment's perspective, the dissent creates an essentially limitless license to litigate the defamatory implications of unmistakable electioneering material, notwithstanding the

among campaign material, "debate on the qualifications of candidates" is particularly "integral to the operation of the system of government established by our Constitution." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989). The U.S. Supreme Court has stressed the prodigious benefits derived from "discuss[ions about the character and qualifications of candidates" for political office:

> The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great.

*Sullivan*, 376 U.S. at 281 (quoting *Coleman v. MacLennan*, 98 P. 281, 286 (Kan. 1908)).

### C.    Two Statements

¶34        With that constitutional backdrop and direction, we now examine the challenged statements and the record to determine whether Young met her burden to defeat summary judgment. Put differently, we must decide whether the record contained enough evidence at summary judgment for reasonable persons to find, by clear and convincing evidence, that the "statement[s] [are] capable of bearing a defamatory meaning . . . under all the circumstances," *Yetman*, 168 Ariz. at 79, "from the standpoint of the average reader" and accounting for "the reasonable expectations of the audience." *Knievel*, 393 F.3d 1073.

#### 1.    Radio ad

*"Smith is a slimy character whose modeling agency specializes in underage girls and advertises on websites linked to sex trafficking."*

¶35        Young contends this statement contained express falsities and implied she and the Agency either support or commit sex crimes. The record at summary judgment does not include clear and convincing evidence that reasonable listeners could hear and understand the statement to assert an actionable express or implied defamatory falsehood.

---

constitutional risk of chilling present and future candidates from challenging the business or occupation of their political opponents. *Infra* ¶ 78.

a.    Express defamation

**¶36**    Young claims the statement expressly defamed her and the Agency because the Agency does not (1) "specialize in underage girls," and either did not (2) "advertise on websites linked to sex trafficking," or (3) did not advertise on such "'websites' in the plural."  Rogers counters that the statement is substantially true or could not be reasonably understood to express an objective statement of verifiable defamatory fact.  We agree with Rogers on this summary judgment record.[6]

**¶37**    Substantial truth is recognized as a complete defense to defamation because "in defamation law, as in life, determinations of fact and fiction are not zero-sum," *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014), and "[s]light inaccuracies will not prevent a statement from being true in substance, as long as the 'gist' or 'sting' of the publication is justified," *Read*, 169 Ariz. at 355-57.  Courts decide the issue of substantial truth on undisputed facts. *Id.*

**¶38**    *"Smith['s] . . . modeling agency specialize[s] in underage girls."*  This statement is substantially true based on the summary judgment record.  Young and the Agency had substantial experience and meaningful expertise in the field of child modeling, not just modeling in general.  About three years before the election, Young wrote an instructional book on how to succeed in child modeling.  Pamela Young, *How to Become a Kid Model: Secrets & Tips to Skyrocket Your Career!* (2015).  Child models comprised around 50 percent of the Agency's models.  And the Agency had a dedicated "Youth Section" on its website for prospective clients "to see the photographs of children that they might want to hire as a model."

**¶39**    The dictionary confirms our conclusion.  "Specialize" is defined as "concentrat[ing] one's efforts in a special activity, field, or practice," "pursu[ing] a special activity, occupation, or field of study," and "provid[ing] something in particular or hav[ing] something as a focus: The

---

[6]    Parenthetically, we acknowledge our discomfort here as the state-sponsored election censor and remain mindful of the constitutional consequences when judges or juries are asked to parse unmistakable campaign ads for implied defamatory meaning.  Voters are entrusted to sift fact from fiction and cast political judgment at the ballot box. *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring) ("The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind [and] every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.'").

shop specializes in mountain-climbing gear." *Specialize*, Merriam-Webster Online, www.merriam-webster.com/dictionary (last visited Nov. 3, 2020); *American Heritage Dictionary* (5th ed. 2020). Meanwhile, "underage" is defined as "less than mature or legal age," "done by or involving underage persons," and "[b]elow the customary or legal age, as for drinking or consenting to sexual relations." *Underage*, Merriam-Webster Online; *American Heritage Dictionary* (5th ed. 2020).

**¶40** *"Smith['s] . . . modeling agency . . . advertise[s] on websites linked to sex trafficking."* The record was undisputed that Steve Smith created a professional "Modeling Agent" profile on Model Mayhem, featuring the Agency's name and logo, because Model Mayhem was "an industry place where all folks in the industry would go if they needed talent." That is advertising and this statement was substantially true. *See Advertisement*, Black's Law Dictionary (11th ed. 2019) (defining "advertisement" as an item published "with the intention of attracting clients"). As for the number of websites, the sting between fact and alleged defamatory fiction is not appreciably different whether Young advertised on one or more websites "linked to sex trafficking." *Read*, 169 Ariz. at 355.

### b. Implied defamation

**¶41** Even if each point is substantially true, Young contends the facts are configured to imply an actual, unstated defamatory statement of fact—that Young and the Agency "aided or [were] complicit in" sex trafficking. Defamation by implication challenges the publication of facts which, taken together, reasonably imply "undisclosed defamatory facts." *MacConnell v. Mitten*, 131 Ariz. 22, 25 (1981). Implied defamation claims necessarily rely on nuance and unstated inferences to reach a conclusion neither written nor spoken—juxtaposing facts to create a defamatory implication. *See Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 889 (9th Cir. 2016) ("If the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or otherwise creates a defamatory implication, he may be held responsible for the defamatory implication,

even though the particular facts are correct.") (quoting *Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir. 2010)).[7]

¶42        Young first claims an implied defamatory meaning from the substantially true statement that Smith's "modeling agency" advertised on Model Mayhem.  Young argues:

> By asserting that The Young Agency advertised on a website "linked to sex trafficking" or "involved in human trafficking," Rogers insinuated that The Young Agency aided or was complicit in those crimes.  "Advertising" on something is often seen as "support" of something.  For example, if the host of a popular television show utters a highly offensive remark, advertisers are often the first to jump ship to avoid any appearance they endorse or support that remark.

From there, Young contends that listeners may reasonably interpret the statement as implying an objective, verifiable defamatory fact—namely, that the unnamed Agency approved or committed child sex crimes—all based on the Agency's decision to advertise on Model Mayhem.

¶43        Summary judgment should have been granted because the record contained no evidence of this implication.  Young presented no evidence, much less clear and convincing evidence, showing that a reasonable factfinder could hear the statement that Young advertised on Model Mayhem as "akin to an accusation of criminal conduct" against Young.  *Harkin*, 874 F.2d at 1251.  The sort of evidence that Young might have introduced, but didn't, includes testimony and opinions of qualified lay and expert witnesses.  *See, e.g.*, *Yetman*, 168 Ariz. at 80 (describing "most important" evidence at defamation trial as the testimony of an objective, informed news reporter who heard the remark as a defamatory accusation

---

[7]    An inherent tension exists between the First Amendment and implied defamation claims.  To account for the tension, the Ninth Circuit has required plaintiffs to affirmatively prove a defendant intended or endorsed the defamatory implication.  *See, e.g.*, *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998); *see also White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990) ("[C]ourts must be vigilant" when "entertaining claims of defamation by implication . . . not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning.").  Arizona courts have not yet required this additional hurdle, even if our supreme court favorably cited *White* in *Yetman*.  168 Ariz. at 79.  We leave the issue for our supreme court to decide in the first instance.

and expert witness opinions "that the remark was susceptible to the interpretation").

### i.   Opinion and argument

**¶44**      Beyond that, the statements are absolutely protected as opinion and argument, rather than fact, under the First Amendment. *AMCOR Inv. Corp. v. Cox Ariz. Publ'ns*, 158 Ariz. 566, 568-69 (App. 1988) ("[W]e might well use 'argument' as a synonym for 'opinion' since we deal with the question whether the words complained of were part of an attempt by the defendants to persuade their readers that a governmental act by the city council was wrong.").

**¶45**      At most, the campaign ads are mixed statements of fact and opinion.   Arizona courts have recognized that "public commentary is almost limitless in its richness and variety" and "frequently intermix[es] statements of fact with evaluations, conclusions, and argumentation." *Id.* at 569.   As a result, we have rejected "any attempt simply to distinguish linguistically between fact and opinion" as "too mechanical," and found "no workable bright-line distinction between fact and opinion." *Id.* at 569, 571.   "Any standard for determining whether a particular piece of commentary is actionable must . . . leave considerable room for 'rhetorical hyperbole,'" and courts "must always be informed by acute awareness of the public's need, reflected in the Constitution, for free debate on public issues." *Id.* at 569, 572.   "The first amendment prohibits efforts to ensure 'laboratory conditions' in politics; speech rather than damages is the right response to distorted presentations and overblown rhetoric." *Stevens v. Tillman*, 855 F.2d 394, 404 (7th Cir. 1988).

**¶46**      Since *Milkovich*, the Ninth Circuit has used a three-factor balancing test to determine whether reasonable persons could hear a statement to imply an assertion of objective fact rather than opinion or argument. *Obsidian*, 740 F.3d at 1293-94.   The test considers (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact; (2) whether the defendant used figurative or hyperbolic language that negates that impression; and (3) whether the statement in question is susceptible of being proved true or false. *Id.* (citing *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990)).   We consider each factor.

- *Whether the general tenor of the entire work negates the impression that defendant was asserting an objective fact.*

¶47      Arizona courts afford "great weight to the context in which the statements are made," *AMCOR*, 158 Ariz. at 570-71, and the "impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person," *Yetman*, 168 Ariz. at 79. "[F]ree debate requires an analysis not only of the words used but also the context in which they appear [and] the entire circumstances surrounding the publication." *AMCOR*, 158 Ariz. at 569. When excising protected opinion from unprotected fact, courts must consider "the wider social and political setting of the publication" and the publication's purpose and "intended audience." *Id.* The "[b]roader social context can include any particular customs or conventions that could signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Chau*, 771 F.3d at 129 (internal quotation marks omitted).

¶48      The words challenged here were uttered in an overtly political radio ad, deliberately framed to secure votes in a heated primary campaign race and plainly aimed at an election opponent. "It is difficult to imagine a public context which would point more strongly toward 'opinion' than [a federal congressional campaign]." *Harkin*, 874 F.2d at 1249. Campaign ads are neither created nor consumed for educational value or balanced perspective, and reasonable listeners of such content "expect to hear a great deal of opinion." *Id.* "[A] campaign press release is not a research monograph; such a release is at least as likely to signal political opinion as a newspaper editorial or political cartoon." *Id.*; *accord Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 244 F.3d 1007, 1019 (9th Cir. 2001) (acknowledging the "well-recognized principle that political statements are inherently prone to exaggeration and hyperbole"). And voters are desensitized to the seasonal swarm of accusations and mind-numbing enmity occasioned by elections. *See Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) (noting that in "a heated political debate," "certain remarks are necessarily understood as ridicule or vituperation, or both, but not as descriptive of factual matters"); *Lynch v. New Jersey Educ. Ass'n*, 735 A.2d 1129, 1136 (N.J. 1999) ("Readers know that statements by one side in a political contest are often exaggerated, emotional, and even misleading.").

¶49      In tone and substance, this radio ad resembles campaign mailers and commercials that biennially flood our airwaves and overwhelm our mailboxes—negating any reasonable impression that the attack ad conveyed or asserted precise and objective facts. *See Obsidian*, 740 F.3d at 1294. The announcer's words, accompanied by "creepy audio effects," represented an unadorned, slanted pitch for votes. The ad's political purpose was overt and transparent. It reflects a hard punch thrown during

a primary brawl, targeting a political opponent and touting a personal narrative, leaving no reasonable listener with the parting impression that the unnamed "modeling agency" has in fact supported or committed sex crimes. *See Desert Sun Publ'g v. Superior Court*, 97 Cal. App. 3d 49, 53 (1979) (stressing the public's tendency to view campaign material as an attack on "loyalties" and "motives" of a political rival rather than an imputation of criminal conduct).

- *Whether the defendant used figurative or hyperbolic language that negates the impression of objective fact.*

¶50        In determining whether a statement, "though appearing to be factual, must be held to be within the First Amendment's protection, we consider the nature of the assertions and their relationship with the rest of the article," including the publication's internal structure, the challenged statement's place in the publication, and "the wider social and political setting of the publication." *AMCOR*, 158 Ariz. at 571.

¶51        The publication here was a campaign radio spot—comprised of 133 words and roughly 11 statements, including eight statements of pure political opinion,[8] two statements of pure fact,[9] and the challenged statement, which mixes fact and opinion. As pure opinion, eight of the statements are absolutely protected under the First Amendment. And when combined, all 11 statements convey a definite political opinion and unvarnished plea for Republican primary voters. "We would be unwarranted in parsing the [full publication] so as to treat these statements differently from the rest of the [publication]." *Id.*; *see also* Robert D. Sack, *Sack on Defamation* § 4:3:1[A], [B] ("Potentially defamatory statements in the guise of statements of fact uttered during a bitter political debate are particularly likely to be understood as rhetorical opinion.").

---

[8]    Eight statements of pure opinion: (1) "Tom O'Halleran is a dangerous leftist and ally of Nancy Pelosi and the open borders lobby," (2) O'Halleran will "win again if we run Steve Smith for Congress," (3) "Smith is a slimy character," (4) Smith "ridiculed our much needed border wall," (5) "Slimy Steve Smith can't beat O'Halleran and the anti-Trump left," (6) "Only Wendy Rogers will" win the general election, (7) "Wendy Rogers strongly supports President Trump and the President's conservative agenda," and (8) Rogers "stand[s] with President Trump, standing with us."

[9]    Two statements of pure fact: (1) "Wendy Rogers is a decorated Air Force pilot [and] small business owner," and (2) "Smith opposed Trump, never endorsed Trump against Clinton."

¶52     Reasonable listeners could not confuse this unmistakable political flamethrower—deployed in the course of a high-profile, mud-filled congressional election campaign—as a statement of objective fact, even if laced with factual grains. *See, e.g.*, *Moats v. Republican Party of Neb.*, 796 N.W.2d 584, 596 (Neb. 2011) (recognizing that "political campaign brochure" is "written to persuade voters to vote against [an opponent] through the use of both rhetoric and hyperbole" and "no reasonable reader would conclude otherwise"). The harsh language in the radio ad dispels any reasonable expectation of objective facts. *Obsidian*, 740 F.3d at 1294.

¶53     The announcer's passing reference to an unnamed "modeling agency" is sandwiched between pointed barbs at political opponents and praise for political allies, sprinkled with references to hot-button immigration issues. Not unexpectedly, the announcer then pivots to Rogers, touting her partisan and military bona fides and promising she will win the general election if nominated. Simply put, one purported "verifiable" statement of fact in a sea of pure opinion "does not justify ignoring the essential nature of the expression of which these statements were a part." *AMCOR*, 158 Ariz. at 571. And the fundamental "need for free and open debate on public issues and governmental action should not be chilled by rules requiring courts artificially to single out statements of fact and treat them in a vacuum, unrelated to the argument of which they are a part." *Id.*

¶54     A final point. In her deposition, Young recounted her accountant's reaction to the campaign ad. The accountant called Young in disbelief, emphasizing it "can't be" and the "things we heard on television, we couldn't believe." But this reflexive disbelief harms rather than helps Young's defamation claim.

- ***Whether the statement in question is susceptible of being proved true or false.***

¶55     Young contends the phrase "specialize[s] in underage girls" represents a precise, specific and verifiable accusation of criminal activity. We are not persuaded. This statement lacks the specificity and precision to be proven objectively true or false. "Under the aegis of the First Amendment, a particular word or phrase ordinarily cannot be defamatory unless in a given context it reasonably can be understood as having an easily ascertainable and objectively verifiable meaning." *Levinsky's*, 127 F.3d at 129; *accord Harkin*, 874 F.2d at 1251 ("[W]e find that in context the challenged statements concerning fundraising are not so precise, specific, or verifiable that they can be equated . . . as akin to an accusation of criminal conduct.").

¶56      This radio ad delivered a plain accusation often leveled by opposing candidates in elections—one candidate denouncing a political opponent's moral compass and partisan bona fides. The ad is plainly aimed at Steve Smith; it never even mentions Young or the Agency. *AMCOR*, 158 Ariz. at 570-71 ("There was no allegation or even an implication that AMCOR was guilty of illegal or criminal conduct. . . . [I]t is important here that the primary target of Jennings' ire was the city council, not AMCOR.").

¶57      We recognize, of course, that the words "specialize in underage girls" could be interpreted to imply criminal misconduct. At a minimum, however, the terms "specialize" and "underage" are vague. "The vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable." *Levinsky's*, 127 F.3d at 129. We cannot ignore, for instance, the reasonable and less nefarious meaning that would neatly fit into a heated political campaign, especially *this* one. According to the record, Rogers wanted voters to conclude that Steve Smith was not the family values candidate he claimed and she hammered Smith's occupation to make that point—that Smith monetized innocence and objectified kids for pure commercial ends. Under that constitutionally protected interpretation, Rogers did not accuse Smith or Young of criminal enterprise, but instead accused Smith of using kids for material gain, partnering with dictatorial and supercilious stage parents who force their toddlers to compete in regional child modeling pageants. *See Knievel*, 393 F.3d at 1075 ("[N]ot all statements that could be interpreted in the abstract as criminal accusations are defamatory" when placed in context.).

¶58      We also recognize that the term "underage girls," when searched on Westlaw, is likely to return criminal cases in which the term has a criminal meaning. The dissent proves the point with a string citation of child pornography cases. *Infra* ¶ 74. But a Westlaw search is unlike the heated political campaign described in this record, which shows that Rogers seized on Smith's day job as a central campaign issue and theme, presenting it as "proof" that Smith lacked family values. *Manzari*, 830 F.3d at 890 ("[A] defamatory meaning must be found, if at all, in a reading of the publication as a whole.").[10]

---

[10]  The dissent claims that Rogers conceded the defamatory implication of "underage girls" when she agreed in her deposition that "Wendy Rogers really likes underage boys" is "seedy sounding." *Infra* ¶ 76. We see no concession. An adult who "really likes underage boys" is plainly unlike a "modeling agency specializ[ing] in underage girls." As untethered to business, the former is intuitively disconcerting; the latter may capture

**¶59** And again, a statement is not actionable simply because it includes or purports to include a patina of fact. "[M]erely because a commentary contains both opinion and alleged fact does not result in the article being actionable in tort." *AMCOR*, 158 Ariz. at 571. Indeed, "[i]t is the rare commentary that will be totally devoid of supporting 'facts' or premises." *Id.* A defamation plaintiff must do more to defeat summary judgment than conjure the possible defamatory meanings of adjective-noun combinations. Courts need not wield a magnifying glass to extract implied accusations of malfeasance embedded in campaign literature, ferreting through factual statements to unearth defamatory meaning. *Chapin*, 993 F.2d at 1098 ("A magnifying glass is no aid to appreciating a Seurat, and the pattern of a complex structure is often discernable only at some distance.").

**¶60** The record at summary judgment lacked evidence to show, by clear and convincing evidence, that reasonable listeners could have understood this political attack ad to actually and objectively imply a precise and verifiable undisclosed fact—namely, that Young and the Agency "were complicit in sexual misconduct with 'underage girls' and aided or were complicit in sex trafficking."

### 2.  Campaign blog

> "*Steve Smith personally advertises on the website, Model Mayhem, a website full of pornographic material, which has also been involved in human trafficking,* according to ABC News*, and has been reported as having a 'dangerous history.'*"

**¶61** Young also contends Rogers defamed her and the Agency in this campaign blog statement, again by implication, because a reasonable reader would infer that Young and the Agency supported or committed sex crimes. This claim cannot survive summary judgment for at least two reasons.

**¶62** First, Rogers had a complete defense to implied defamation under the First Amendment because the statement directed readers to the source of her information. A publication that discloses the factual basis for its negative conclusion "typically falls within the protection of the First Amendment, even if it relies on faulty reasoning." *See Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995) ("The courts of appeals that have considered defamation claims after *Milkovich* have consistently held that when a speaker outlines the factual basis for his conclusion, his statement

---

Young's expertise and well-earned reputation in the competitive world of child models.

is protected by the First Amendment."). Applied here, the underlined words—"according to ABC News"—were hyperlinked to the campaign's source of information, the ABC News article about Model Mayhem's "dangerous history." *Supra* at ¶¶ 5-6.

¶63 Young criticizes Rogers' reliance on the ABC News article because Rogers did not verify the content she relied on before posting it. But the article accurately reported a lawsuit against Model Mayhem—with quotes and attribution from sources (a model, photographer and detective) who expressed their concerns about sexual predators lurking on the Model Mayhem platform. Rogers had no reason to doubt the article's accuracy. *Cf. St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (no reckless disregard when no evidence of probable falsity, even without evidence of reputation for veracity).

¶64 Second, we cannot ignore the blaring takeaway in bold, red print: "Steve Smith is a FAKE and is NOT the pro-traditional family values candidate that he claims to be!" The statement's tenor and substance are directed with laser focus at candidate Steve Smith—not Young or her agency. Rogers shined a caustic, tendentious spotlight on her political opponent's moral compass and family-values narrative. *See Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) ("[W]ords and punctuation express meaning. Meaning is the life of language.").

¶65 Young counters that Smith's day job is irrelevant because he "kept his work at The Young Agency separate from his political activity," and the Agency never donated to or participated in Smith's campaigns. That misses the point. Smith worked full-time at the Agency for over a decade before running for Congress—building a reputation and earning a livelihood. Put bluntly, a candidate's business is the people's business—standard fare and fair game in an election contest. *Cf. Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 300 (Tenn. Ct. App. 2007) ("[T]o have the presence of a private person shield a public official from reports about his or her official misconduct would begin to rot the underlying foundation of the freedoms of speech and of the press."). For good or ill, Smith and his business or occupation are inseparable to voters who are understandably interested in a candidate's moral fiber. *Garrison*, 379 U.S. at 77 (the public's rightful scope of investigation encompasses "anything which might touch on [a candidate's] fitness for office [including] dishonesty [and] malfeasance"). And future candidates should not avoid the topic for fear of incurring civil tort damages. *Schiavone Const. Co. v. Time, Inc.*, 619 F. Supp. 684, 705 (D.N.J. 1985) (discussion of federal nominee "could hardly proceed without discussion of his ties" to plaintiff construction company).

¶66      The court sympathizes with Young, who has cultivated a sterling reputation and who never pursued the political spotlight.  But on this record, summary judgment was required.  The record lacks clear and convincing evidence that reasonable persons heard the challenged half-sentence about Smith's personal advertising practices to imply that Young and the Agency assist "sex trafficking" or support "sexual misconduct with underage girls."  A creative defamation claim must not muffle debate or impinge fundamental rights and processes.  We recognize that political speech is sometimes unpleasant if not unpalatable, but the importance of free and uncensored debate overshadows the danger of misuse on this record.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

## II.      Punitive Damages: Actual Malice

¶67      For those and more reasons, the superior court should have also granted summary judgment on the punitive damages claim and denied Young's motion to compel evidence of Rogers' net worth.  A defamation claim for punitive damages requires clear and convincing evidence of actual malice.  *Gertz*, 418 U.S. at 349; *Read*, 169 Ariz. at 356.  Actual malice requires proof that the defendant acted "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not."  *Sullivan*, 376 U.S. at 280.  "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989).

¶68      Young's evidence of actual malice at summary judgment included the fact that (1) Rogers was motivated "to defame the Young Agency" by "attack[ing] the character of her political enemy Smith," and that (2) "Rogers failed to ascertain" the status of litigation mentioned in the ABC News article.  But, even together, "motive" and "an extreme departure from professional standards . . . cannot provide a sufficient basis for finding actual malice."  *Id.* at 664-65.

## III.     False Light

¶69      The superior court should also have dismissed Young's false light invasion of privacy claim at summary judgment.  A false light claim requires actual malice.  *See Desert Palm Surgical Grp. v. Petta*, 236 Ariz. 568, 580, ¶ 29 (App. 2015) (actual malice an element of false light invasion of privacy).  The record lacked such evidence.

## CONCLUSION

¶70 We reverse the superior court and enter summary judgment for Rogers.

C A T T A N I, J., dissenting:

¶71 The majority opines that no reasonable person could possibly understand the statement that the Young Agency "specializes in underage girls and advertises on websites linked to sex trafficking" to insinuate that the Young Agency was complicit in child sex trafficking or similar wrongful, even criminal conduct. But that appears to be precisely what was insinuated. Because a reasonable person could understand the statement's clear and potentially defamatory implication, the superior court correctly denied Rogers's motion for summary judgment. Accordingly, I respectfully dissent from this court's opinion reversing that ruling.

¶72 As detailed by our supreme court in *Yetman v. English*, the superior court is the initial gatekeeper in defamation cases, tasked with deciding whether the statement at issue is capable of bearing a defamatory meaning. 168 Ariz. 71, 78–79 (1991); *see also Sign Here Petitions LLC v. Chavez*, 243 Ariz. 99, 105, ¶ 20 (App. 2017). In performing this duty, the court must assess the literal words of the statement and "the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person," considering the statement under the circumstances in which it was made. *Yetman*, 168 Ariz. at 76 (emphasis and citation omitted). "The key inquiry is whether the challenged expression . . . would reasonably appear to state or imply assertions of objective fact." *Id.* (emphasis and citation omitted). If the court determines that the statement is capable of bearing a defamatory meaning, the jury, rather than the court, is the ultimate arbiter of "whether the defamatory meaning of the statement was in fact conveyed." *Id.* at 79. In my view, the superior court here did precisely what *Yetman* directs: it reasonably concluded that the statement in the radio ad was capable of bearing a defamatory meaning and properly left the resolution of the case to the jury.

¶73 The majority may be correct that the radio ad was not outright false in stating that the Young Agency "specializes in underage girls and advertises on websites linked to sex trafficking": the Young Agency employs female models who are under the age of majority, and it has advertised on the Model Mayhem website, which, like other websites— including Craigslist and Facebook—has apparently been used by bad actors (unrelated to the website operators) who committed sexual offenses. But the fact that Rogers's statements may be technically correct does not insulate her from potential liability for what she insinuated rather than said

explicitly. *See Phx. Newspapers, Inc. v. Church*, 103 Ariz. 582, 587–88 (1968). And there is little question that a jury could find Rogers's juxtaposition of "underage girls" and "sex trafficking" in the same sentence to insinuate that the Young Agency was involved in highly questionable—if not illegal— activities.

¶74        Rogers's use of the term "underage girls" is particularly telling. The term "underage" here is untethered to its ostensible context— a model under the age of 18 is not "underage" for purposes of portraying a child under the age of 18. Even the majority's preferred interpretation— that the term referred to the children of "dictatorial and supercilious stage parents who force their toddlers to compete in regional child modeling pageants," *see supra* ¶ 57—is not really captured because the term includes 17-year-olds as well. But even assuming the term's technical accuracy in denoting individuals under the age of majority, its connotation is far less innocent; in case law, for example, "underage girls" is used almost exclusively in the context of sexual conduct with victims under the age of consent. *See, e.g.*, *City of Los Angeles v. Patel*, 576 U.S. 409, 436 (2015) (Scalia, J., dissenting) (referring to "prostitution of underage girls"); *State v. Burgess*, 245 Ariz. 275, 278, ¶ 11 (App. 2018) (addressing child prostitution statute); *Mangan v. Mangan*, 227 Ariz. 346, 349, ¶ 10 (App. 2011) (noting "illegal pornography sites that appeared to depict violence against underage girls"); *State v. Fischer*, 219 Ariz. 408, 416, ¶ 27 (App. 2008) (referencing "underage girls" in the context of the crime of sexual conduct with a minor). And nothing suggests a different context here.

¶75        Even Rogers herself seems to recognize the highly charged nature of the term "underage girls." Rogers's reply in this special action characterizes the radio ad as stating that "the Young Agency 'specializes' in representing *minors*." (Emphasis added.) Had the ad actually said "minors" rather than "underage girls," Rogers's assertion that the statement was factual and relatively benign would be more persuasive. But that is not what was said.

¶76        Rogers's deposition testimony further underscores this point. Responding to questioning, she agreed, for example, that she "generally like[s] children," both male and female. But when asked, "True or False, Wendy Rogers really likes underage boys?" Rogers responded, "False" because that phrasing has an "undesirable nuance" and is "seedy-sounding." A jury could likewise conclude that when Rogers broadcast an ad characterizing the Young Agency's specialty as "underage girls," she necessarily inserted, to use her own words, an "undesirable nuance" and left the impression that the agency was "seedy."

¶77 And this "undesirable nuance" was compounded by the immediately following reference to "advertis[ing] on websites linked to sex trafficking." Specializing in underage girls and linked to sex trafficking? A reasonable person could easily understand the subtext as a statement that the Young Agency was complicit in child sex trafficking or similar wrongful, even criminal conduct. And the political nature of the ad does not override that clear implication.

¶78 The majority has essentially held that, because the statement appeared in a political attack ad in a "spirited, combative and sometimes unpleasant" election campaign, no one could understand it as an assertion of fact. *See supra* ¶¶ 9, 44–60. Setting aside the irony of concluding that the statement and its obvious implication could not be understood as a statement of provable fact while also finding that the statement is substantially true, *see supra* ¶¶ 36–40, the majority's position essentially creates a limitless license to lie about someone not associated with any political campaign as long as the lie is bookended by comments disparaging the values held by one's actual political opponent. But the political focus of an ad could not possibly preclude a defamation claim, for example, based on a demonstrably false statement that the candidate's employer is a convicted rapist, and in my view, the same reasoning applies here. *See Yetman*, 168 Ariz. at 76 (requiring analysis not just of the "general tenor" of the expression where a challenged statement appears, but also the literal words and the impression created by those words). Thus, I agree with the superior court that Young is entitled to present the case to a jury.

¶79 Citing *Yetman*, the majority suggests that Young's claim was essentially unprovable without "testimony and opinions of qualified lay and expert witnesses." *See supra* ¶ 43. Respectfully, and as in *Yetman* itself, such testimony might be valuable *trial* evidence, but it is not necessary to the court's *legal* determination of "whether the challenged expression . . . would reasonably appear to state or imply assertions of objective fact." *Yetman*, 168 Ariz. at 76 (emphasis and citation omitted). The majority cites no authority for the proposition that a plaintiff must offer proof that someone who heard or saw the statement actually did think it was defamatory. As *Yetman* held, the issue on summary judgment is simply whether the statement is "*capable* of bearing a defamatory meaning." *Id.* at 79 (emphasis added). Moreover, Pamela Young described having the type of evidence the majority suggests was missing: the modeling agency's accountant, for example, contacted her in disbelief at the radio ad's allegations. The majority ignores the accountant's understanding of the ad's insinuation while focusing instead on the accountant's disbelief, which may reasonably be attributable to his familiarity with the Young Agency

and not, as the majority suggests, to his supposed opinion that the statements were per se unbelievable. *See supra* ¶ 54.

¶80 Finally, while acknowledging the standard set forth in *Yetman*, the majority ignores *Yetman*'s holding. The court opined in that case that neither side was entitled to judgment as a matter of law on a defamation claim against a legislator who asked—in reference to a member of a county Board of Supervisors—"What kind of communist do we have up there that thinks it's improper to protect your [property] interests?" *Yetman*, 168 Ariz. at 73, 82. The *Yetman* court reasoned that while "the comment, made in such a setting and in such a context, could easily be interpreted as nothing more than rhetorical political invective or hyperbole," its words were nevertheless "sufficiently ambiguous that a reasonable listener in that audience . . . might reasonably interpret the words as a statement or implication of fact." *Id.* at 79–80.

¶81 The same is true here. Perhaps the statement was simply rhetorical hyperbole excoriating Steve Smith for his association with child models and their "dictatorial and supercilious stage parents," but the majority itself acknowledges "that the words 'specialize in underage girls' could be interpreted to imply criminal misconduct." *See supra* ¶ 57. And that is precisely why Young is entitled to present the case to a jury. *See Yetman*, 168 Ariz. at 79 ("There remains the category of cases involving assertions to which reasonable people might clearly give conflicting interpretations. In these cases, the question must be left to the jury.").

¶82 If this matter goes to trial, Rogers will undoubtedly present the arguments about context and attenuation advanced by the majority. But on this record, we may grant her relief only if we conclude that, as a matter of law, her statement characterizing the Young Agency as one that "specializes in underage girls and advertises on websites linked to sex trafficking" could not be understood to insinuate wrongful conduct by the Young Agency. Because that appears to be the very impression conveyed, and because reasonable jurors could in fact hear it that way, in my view, Young is entitled to present the case to a jury.

¶83       In sum, I agree with the superior court's ruling denying Rogers's motion for summary judgment, and I respectfully dissent from the majority's contrary opinion.



AMY M. WOOD • Clerk of the Court
FILED:   AA